SD/DG/2024R00566



USDC- BALTIMORE
'24 OCT 16 PM4:30

### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * **Criminal No.** JRR 24-0303 |
| | * |
| v. | * **(Conspiracy, 18 U.S.C. § 371; Bribery, 18 U.S.C.** |
| | * **§ 201(b); Mail Fraud, 18 U.S.C. § 1341;** |
| | * **Money Laundering, 18 U.S.C. § 1957;** |
| **BREAL L. MADISON JR.,** | * **Forfeiture, 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. §** |
| | * **2461(c), 18 U.S.C. § 982(a)(1), 21 U.S.C. § 853(p)** |
| **Defendant.** | * |
| | * **UNDER SEAL** |
| | * |
| | * |

### INDICTMENT

### COUNT ONE
### (18 U.S.C. § 371 – Conspiracy)

The Grand Jury for the District of Maryland charges that:

### Introduction

1.      From at least in or about 2017 through in or about 2023, the Defendant, **BREAL L. MADISON JR.** ("**MADISON**"), repeatedly abused his position as a high-ranking sales executive for Company 1 to enrich himself by conspiring with BRANDON SCOTT GLISSON, LAWRENCE A. EADY, and others to defraud government intelligence agencies of procurement funds and to deprive Company 1 of profits. In carrying out this scheme, among other things, the Defendant:

      a. Fraudulently submitted and caused to be submitted to federal agencies bid prices, or "quotes," that sought funds for services and products that were never provided;

      b. Caused federal agencies to pay fraudulently obtained funds to the bank accounts of two companies under **MADISON**'s and GLISSON's control: Trident Technology Solutions, LLC ("Trident") and Alpha Greatness Omega ("AGO");

      c. Made false representations about the independence and legitimacy of Trident and AGO to Company 1 officials, federal agency clients, and distribution vendors;

1

    d. Paid and caused to be paid no less than $600,000 in bribes to EADY, a public official employed by Agency 1, to enlarge and steer procurement contracts to Company 1; and

    e. Made kickback payments to GLISSON for his participation in the scheme and facilitation of bribe payments to EADY.

2.    **MADISON** engineered this scheme to enrich himself and used proceeds from the scheme to purchase the following: (1) $1 million paid toward the purchase of a 58-foot yacht; (2) luxury vehicles, including a Lamborghini, three Mercedes Benzes, and two Cadillac Escalades; (3) a nearly $425,000 investment in a cannabis company; and (4) a $250,000 investment in a technology company.

## Relevant Individuals and Entities

3.    **MADISON** was a resident of Maryland, and was employed by Company 1, a cloud data management and data security company headquartered in Palo Alto, California. **MADISON'S** employment at Company 1 included responsibilities for selling hardware and software solutions ("IT Products") to government agencies. In his role, **MADISON** had authority to set Company 1's pricing in quotes that were ultimately transmitted to government agency customers, including Agency 1.

4.    **MADISON** sold Company 1's IT Products to government agencies through a distribution channel that included distributors and resellers. **MADISON** routinely provided Company 1 pricing for IT Products to distributors via email. Distributors used Company 1's pricing to generate a revised quote on the distributor's letterhead that incorporated the distributor's margin. The distributor's quote was often transmitted to resellers who further revised the quote to incorporate the reseller's margin. The quotes were subsequently transmitted to government agency customers. In some instances, **MADISON** transmitted quotes prepared by the distributor or reseller directly to government agency customers. After selecting a quote for IT Products,

2

government agency customers transmitted payment via wire through the distribution channel, typically from the customer to the reseller, reseller to distributor, and distributor to Company 1.

5.      Trident was a shell company incorporated in the State of Delaware and controlled by **MADISON**. Trident did not provide any bona fide services, but was a vehicle through which **MADISON** stole millions of dollars.

6.      LAWRENCE EADY was a public official at Agency 1 within the meaning of 18 U.S.C. § 201. As part of his regular duties, EADY was responsible for identifying and recommending information technology solutions for Agency 1. EADY had regular access to procurement information and had influence in Agency 1's procurement process, including by influencing whether Agency 1 purchased various products, as well as when and how much of a product Agency 1 purchased.

7.      BRANDON SCOTT GLISSON was a government contractor who worked closely with EADY. GLISSON worked on-site at Agency 1 and had access to procurement information, similar to EADY's access. GLISSON incorporated AGO in the Commonwealth of Virginia.

8.      Company 2, referred to herein in combination with its subsidiaries and affiliated entities, was an IT distributor headquartered in Virginia. Company 2 Employee 1 and Company 2 Employee 2 were employees of Company 2.

9.      Individual 1 was a resident of Maryland, a minor, and **MADISON**'s son.

10.     Individual 2 was a resident of Virginia.

11.     Bank 1 was a financial institution headquartered in North Carolina.

12.     Bank 2 was a financial institution headquartered in San Francisco, California.

13.     Bank 3 was a financial institution headquartered in Virginia.

### The Scheme to Defraud

14.    From in or around at least November 2017 until in or around at least December 2023, in the District of Maryland and elsewhere, the Defendant,

### BREAL L. MADISON JR.,

and others both known and unknown to the Grand Jury, did knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud the United States, and for the purpose of obtaining money and property from the United States by means of materially false and fraudulent pretenses, representations, and promises, to wit, causing the preparation and submission of materially false and fraudulent bids and quotes to government agencies that inflated the amount of money and property obtained as a result of those bids for personal enrichment (hereinafter "Scheme to Defraud").

### The Conspiracy to Execute the Scheme to Defraud

15.    From in or around at least November 2017 until in or around at least December 2023, in the District of Maryland and elsewhere, the Defendant,

### BREAL L. MADISON JR.,

did knowingly and willfully conspire, combine, confederate, and agreed with BRANDON SCOTT GLISSON, LAWRENCE EADY, and other co-conspirators known and unknown to members of the Grand Jury, to commit certain offenses against the United States, namely:

a.    mail fraud, that is, to knowingly execute and attempt to execute the Scheme to Defraud through the use of the U.S. Postal Service in violation of Title 18, United States Code, Sections 1341; and

b.    bribery, that is, to directly and indirectly corruptly give, offer, and promise anything of value to a public official, with intent to influence any official act and to influence such public official to commit and aid in committing and to collude, and allow, and to make opportunity

4

for the commission of a fraud on the United States, and to induce such public official to do an act in violation of the lawful duty of such public official, to wit: **MADISON** and GLISSON directly and indirectly gave money to EADY, a public official, to influence EADY to undertake official acts related to procurements of Company 1 products and services, to influence EADY to commit, aid in committing, collude in, allow, and make opportunities for the commission of fraud on Agency 1, and to induce EADY to do and omit to do an act in violation of his lawful duty, in violation of Title 18, United States Code, Section 201(b).

## The Purpose of the Conspiracy and Scheme to Defraud

16.     It was the purpose of the conspiracy and Scheme to Defraud for **MADISON** and his co-conspirators to obtain money and property from Company 1 and government agencies through material misrepresentations and omissions by fraudulently diverting funds disguised as "rebates" from Company 1 and government agencies into shell companies, which **MADISON** and his co-conspirators used to make investments, purchase luxury items, and pay bribes to EADY, and in return for EADY to agree to use his influence as a public official at Agency 1 to procure products from Company 1, providing **MADISON** with a stream of contracts with which to continue the fraudulent scheme.

## Manner And Means

17.     It was part of the conspiracy and Scheme to Defraud that **MADISON** created and operated Trident and GLISSON operated AGO as shell companies that were paid funds derived from government agency customers without providing bona fide services.

18.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON** concealed his ownership of and affiliation with Trident in order to induce Company 1, Company 2, and government agency customers to incorporate and pay funds to Trident by, among other

5

things, using a UPS Store mailbox as the mailing address for Trident and falsely representing that Trident was owned by Individual 1, who in truth and fact was **MADISON**'s minor son.

19.     It was further a part of the conspiracy and Scheme to Defraud that from in and around June 2018 to in and around November 2023, **MADISON** used his authority to manipulate Company 1's pricing in quotes for IT Products to government agency customers. He then instructed Company 2 employees via email to revise the quotes to incorporate additional funds disguised as "rebates" to be paid to Trident or AGO by falsely claiming these "rebates" were for services performed by Trident or AGO.

20.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON** made materially false representations to employees at Company 2 about the nature of the funds to be paid to Trident and his affiliation with Trident to induce them to incorporate kickbacks to Trident into quotes.

21.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON**, GLISSON, and EADY prepared and submitted, and caused to be prepared and submitted, fraudulently inflated quotes to government agency customers, including Agency 1.

22.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON** made materially false representations and omissions to his supervisor and others at Company 1 about the nature of the funds to be paid to Trident and AGO to induce them to approve kickbacks to Trident and AGO.

23.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON**, GLISSON, and EADY caused government agency customers, including Agency 1, to pay fraudulently inflated quotes.

24.     It was further a part of the conspiracy and Scheme to Defraud that between March 2019 and December 2023, **MADISON** caused Company 2 to mail to Trident more than thirty kickback checks totaling $7,375,148.63 in fraudulent funds obtained from government agency customers through this scheme. Company 2 sent the checks via the United States Postal Service to a UPS Store mailbox rented by **MADISON**.

25.     It was further a part of the conspiracy and Scheme to Defraud that between October 2018 and September 2020, **MADISON** and GLISSON caused Company 2 to issue five kickback checks to AGO totaling $1,712,500 in fraudulent funds obtained from Agency 1 through this scheme. Company 2 sent the checks via the United States Postal Service to GLISSON's home.

26.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON** deposited the kickback checks to Trident into the account ending -9381 at Bank 1 and used the kickbacks for personal purchases and also transferred the funds to other bank accounts that he owned and controlled for his personal use. **MADISON** spent the kickbacks that he obtained through Trident on jewelry, multiple vehicles, a yacht, investments, and other personal purchases.

27.     It was further a part of the conspiracy and scheme that GLISSON deposited the kickback checks to AGO into the account ending -8045 at Bank 3 and used the funds for personal purchases as well as for the payment of bribes to EADY.

28.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON**, GLISSON, and EADY agreed to pay and did pay bribes to EADY out of the kickbacks sent to AGO in exchange for official acts by EADY to facilitate the procurement of Company 1 products and services by Agency 1 and other government agencies.

29.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON**, GLISSON, and EADY communicated about obtaining kickbacks in connection with government agency procurements and about paying or receiving bribes.

30.     It was further a part of the conspiracy and Scheme to Defraud that, in exchange for the bribe payments, EADY engaged in official acts to facilitate procurements of Company 1 products and services by Agency 1 and other government agencies by, among other things, discussing and promoting Company 1 products and services with others, encouraging others to purchase Company 1 products and services, influencing procurements for Company 1 products and services, and providing procurement information to **MADISON**.

31.     It was further a part of the conspiracy and Scheme to Defraud that **MADISON**, GLISSON, and EADY concealed the payments and their use of the kickbacks to Trident, AGO, and EADY from fraudulently derived funds.

### Overt Acts in Furtherance of the Conspiracy and Scheme to Defraud

32.     In furtherance of the conspiracy and to accomplish its objects, the following overt acts were committed in the District of Maryland, and elsewhere:

33.     On or about January 24, 2018, GLISSON incorporated AGO in the Commonwealth of Virginia. GLISSON was the owner and an employee of AGO. AGO operated as a front company for GLISSON to fraudulently obtain government funds, and through which **MADISON** and GLISSON paid bribes to EADY.

34.     On or about April 19, 2018, **MADISON** rented a mailbox at a UPS Store in Bowie, Maryland to use as the mailing address for Trident and thereby conceal his ownership of and affiliation with the company.

35.     On or about June 5, 2018, **MADISON** incorporated Trident in the State of Delaware. **MADISON** was the owner and an employee of Trident. Trident was not an actual

business and instead operated as a shell company and slush fund for **MADISON** to fraudulently obtain government funds.

36.     On or about June 6, 2018, **MADISON** created the anonymous email account sales@trident-techsolutions.com and sent a "test" email to his Company 1 email account.

37.     On or about June 12, 2018, **MADISON** emailed Company 2 Employee 2 and provided Individual 1's name and phone number as the point of contact for Trident and sales@trident-techsolutions.com as Individual 1's email address, falsely representing to Company 2 that Trident was a legitimate company owned by Individual 1. The same day, **MADISON** texted Individual 1, "I listed you as a contact for the company i just created…Trident Technology Solutions. DO NOT ANSWER phone numbers you don't recognize from Herndon/Reston VA. Let the voicemail pick it up and then let me know about the messages."

38.     Consistent with the scheme, between June 2018 and October 2023, **MADISON** repeatedly emailed Company 2 instructing employees to create quotes that contained kickbacks to be paid to Trident.

39.     On or about August 7, 2018, **MADISON** emailed Company 2 requesting a quote that contained a kickback for AGO. The same day, **MADISON** received the inflated quote and emailed it GLISSON, sending the quote from Company 1's email server in California to Agency 1 in Virginia. **MADISON** informed GLISSON that the quote contained the kickback, to which GLISSON replied, "I like it. Will talk to [EADY] tomorrow."

40.     On or about August 29, 2018, GLISSON texted **MADISON** to discuss their scheme to fraudulently obtain money, writing:

- GLISSON: "Look dude I am here to make you as much money as possible and make money myself. Let's figure out a way to do this together. We already have an established relationship…This should be a no-brainer. You know what it is I need. And let's get the meeting set up with the CEO and

go from there. I trust you. I know that you will do what's right by both of us. Convo is done for the night but let's see where this picks up tomorrow. I'm really excited and I think we can both become rich."

\* \* \*

- GLISSON: "I want to be wealthy...but with a 'B' in front of my money...Millions are for those that don't think about shit and fall into money."

41. On or about September 6, 2018, GLISSON texted **MADISON** about a kickback check that he expected to receive:

- GLISSON: "So I'm excited and scared and nervous all at the same time lol."

- **MADISON**: "Haha man I got it. You'll feel more and more at ease when the rebate checks start flowing more consistently!"

- GLISSON: "My problem is [] I just don't feel like I've done anything for it LOL."

- **MADISON**: "Look, the insight you've given over the course of the last 9 months has been INVALUABLE...helping me navigate...when other resellers don't do SHIT...is worth its weight in gold to me."

42. On or about October 18, 2018, Company 2 issued and mailed a kickback check of $80,000 to AGO. On October 23, 2018, GLISSON deposited the kickback check of $80,000.

43. On or about December 7, 2018, EADY facilitated the issuance of a purchase order by Agency 1 for Company 1 products. On the same day, GLISSON texted **MADISON** "FYI...PO got done today. [EADY] made it happen."

44. On or about February 21, 2019, EADY revised an Agency 1 budget to support the purchase of Company 1 products. GLISSON texted **MADISON** about EADY's actions to influence a procurement of Company 1 products:

- GLISSON: "[EADY] reworked the numbers to show a surplus of money in 2028 and that's the slide deck that he has to get in front of [EADY's superior]. Trust me if I thought dropping the money would do it I would have been on the phone with you."

10

- **MADISON**: "Well I'm keeping fingers crossed! Believing in [EADY]!!!"

      \*      \*      \*

- GLISSON: "I have never seen [EADY] not get what he wants so it may take a little bit but I've got faith."

45.     On or about February 22, 2019, **MADISON** emailed a Company 2 employee with instructions to create a quote incorporating kickbacks to Trident and AGO: "Please put on [Company 2] paper and add the following rebates for the partners involved in making this happen; AGO (Glisson) - $1,000,000…Trident Technology Solutions - $94,750."

46.     On or about March 11, 2019, **MADISON** opened a checking account ending -9381 and a savings account ending -9394 on behalf of Trident at Bank 1. **MADISON** was the sole authorized signatory for each bank account.

47.     On or about March 15, 2019, Company 2 issued and mailed from Virginia to Maryland a kickback check of $32,752.61 to Trident. Consistent with the scheme, between March 2019 and December 2023, **MADISON** caused Company 2 to issue and mail to Trident more than thirty kickback checks totaling $7,375,148.63 in fraudulent funds, including checks issued on:

    a.   July 16, 2020 (for $500,445.29);

    b.   October 22, 2020 (for $686,090.58);

    c.   March 11, 2021 (for $454,250.00);

    d.   October 12, 2022 (for $757,242.00); and

    e.   January 19, 2023 (for $482,750.00).

48.     On or about March 15, 2019, Company 2 issued and mailed a kickback check of $140,000 to AGO. On or about April 23, 2019, GLISSON deposited the kickback check of $140,000.

11

49.     On or about April 22, 2019, **MADISON** deposited the first kickback check from

Company 2 to Trident for $32,752.61 into the bank account ending -9381 at Bank 1. Consistent

with the conspiracy, between April 2019 and December 2023, **MADISON** deposited over thirty

kickback checks from Company 2 to Trident, including on or about July 24, 2020, October 26,

2020, March 16, 2021, October 20, 2022, and February 3, 2023.

50.     On or about December 18, 2019, **MADISON** deposited a kickback check to Trident

shown in the photo below:



51.     On or about May 2, 2019, **MADISON** directed Company 2 Employee 1 via email

to incorporate kickbacks for Trident into two quotes, falsely claiming that that Trident would "be

conducting the implementation activities on this one."

52.     On or about May 31, 2019, **MADISON** emailed an employee of Company 2

regarding a quote that incorporated a kickback for Trident and falsely claimed that "Trident

actually goes inside and performs" services for the government customer.

53.     On or about June 12, 2019, Company 2 issued and mailed a kickback check of

$1,000,000 to AGO. On July 27, 2019, GLISSON deposited the kickback check of $1,000,000.

54.     On or about August 27, 2019, GLISSON texted **MADISON** about EADY:

- GLISSON: "He saw [another procurement]…and asked what, if anything,
  you were doing for us. I'm going to throw him a bone on my own. He needs

to retire. Feeling like we got in bed with the devil. He provides a LOT…but it comes at a cost."

*     *     *

- GLISSON: "I forgot that he sits on that damn [board] so he sees all the procurements."

55.     On or about August 9, 2019, GLISSON issued a check from AGO to EADY totaling $190,000. GLISSON hand-delivered the check to EADY

56.     On or about August 9, 2019, EADY deposited the check into his personal bank account.

57.     On or about October 7, 2019, GLISSON texted **MADISON** about his recent purchase of a 2017 BMW 650i and his intent to avoid drawing attention to his purchase:

- GLISSON: "No…I will not take that to the office…I don't want that extra attention LOL."

58.     On December 7, 2019, **MADISON** texted GLISSON about his concerns that their fraudulent quotes had grown too large:

- **MADISON**: "Last order got inflated to the point of not being cheap."

*     *     *

- **MADISON**: "that was way too much extra margin to put on top…I told you…"

59.     On or about February 28, 2020, GLISSON issued a check from AGO to EADY totaling $190,000.

60.     EADY deposited the foregoing check into his personal bank account on or about March 4, 2020.

61.     On or about April 24, 2020, **MADISON** emailed his supervisor in response to a request for information about a kickback payment for Trident, falsely claiming that the payment was:

13

> Same drill as before. Backend rebate paid for
> -clearance administration
> -oconus travel and implementation for the existing 16 assets over 8 sites
> -hourly rate and costs associated with their engineers

In truth and fact, **MADISON** knew Trident did not employ any engineers and did not provide implementation services, on-site services, or clearance administration related to the quoted projects.

62.     On or about May 22, 2020, **MADISON** responded to an email from a coworker who asked "[W]ho is Trident Technology Solutions" by falsely representing that Trident was the "Partner that helped facilitate the original deal."

63.     On or about June 5, 2020, **MADISON** impersonated Individual 2 by emailing Company 2 Employee 1 from the email address [Individual 2]@trident-techsolutions.com and providing documentation about Trident that appeared to have been completed by Individual 2. In truth and fact, **MADISON** completed and sent paperwork to Company 2 Employee 1.

64.     On or about June 8, 2020, **MADISON** emailed Company 2 Employee 1 regarding a purported conversation with Individual 1, writing: "[Individual 1] did NOT respond favorably to the news that the [] payment was pushed out to July. They are preparing for deployments end of June/first week back from the 4th of July holiday. We cannot have ANY delays with issuance of that payment." In truth and fact, **MADISON** knew Trident did not deploy any employees to provide services related to the quoted project and did not have such a conversation with Individual 1.

65.     On or about June 16, 2020, Company 2 issued and mailed a kickback check of $7,500 to AGO.

66.     On July 3, 2020, GLISSON deposited the kickback check of $7,500.

14

67.     On or about June 18, 2020, **MADISON** concealed his affiliation with Trident to induce Company 2 Employee 1 to establish Trident as a vendor to Company 2 in order to facilitate payments to Trident, emailing: "Confirm when Trident status as vendor is setup with [Company 2] so I can report back to [Individual 1] and [Individual 2]. They're looking very forward to making this process go along smoother and more quickly." In truth and fact, Individual 1 and Individual 2 did not have any such involvement with Trident.

68.     On or about September 18, 2020, Company 2 issued and mailed a kickback check of $485,000 to AGO.

69.     On September 25, 2020, GLISSON deposited the kickback check of $485,000.

70.     On or about October 8, 2020, GLISSON issued a check from AGO to EADY totaling $250,000.

71.     EADY deposited the foregoing check into his personal bank account on or about October 15, 2020.

72.     On or about August 6, 2021, **MADISON** wired $250,000 to an account at Bank 2 for an investment in a technology company. Consistent with the scheme, between April 2019 and at least July 2024, **MADISON** used the funds obtained as kickbacks to Trident for personal expenses, including:

> a. On or about March 7, 2022, **MADISON** wired $11,342.46 from a Trident account at Bank 1 for the payment of a credit card balance.
>
> b. On or about March 31, 2022, **MADISON** wired $34,000 from a Trident account at Bank 1 for an investment in a cannabis company.
>
> c. On or about April 29, 2022, **MADISON** wired $33,256.00 from the Trident account at Bank 1 for the purchase of a vehicle.

d.  On or about April 29, 2022, **MADISON** wired $16,500.00 from the Trident

account at Bank 1 for an investment in a cannabis company.

18 U.S.C. § 371

## COUNTS TWO THROUGH THREE
### (18 U.S.C. §§ 201(b) - Bribery)

The Grand Jury for the District of Maryland further charges that:

1.   The allegations in paragraphs 1 through 72 of Count One are incorporated herein by reference.

2.   On or about the dates set forth below, in the District of Maryland and elsewhere, the Defendant,

### BREAL L. MADISON JR.,

did directly and indirectly, corruptly give, offer, and promise the things of value listed below to EADY with the intent to influence an official act, to induce EADY to violate his lawful duty, and to influence EADY to commit, aid in committing, and collude in and allow, a fraud and make opportunity for the commission of a fraud on the United States; that is, **MADISON** and GLISSON directly and indirectly gave money to EADY: (A) to influence EADY to undertake official acts related to procurements of Company 1 products and services; (B) to influence EADY to commit, aid in committing, collude in, allow, and make opportunities for the commission of fraud on Agency 1; and (C) to induce EADY to do or omit to do an act in violation of his lawful duty of assisting in the procurement of goods and services in a manner free from conflicts of interest.

| COUNT | APPROX. DATE | OBJECT OF VALUE |
|---|---|---|
| 2 | 03/04/2020 | Payment of $190,000 from Alpha Greatness Omega to EADY |
| 3 | 10/16/2020 | Payment of $250,000 from Alpha Greatness Omega to EADY |

18 U.S.C. § 201(b)
18 U.S.C. § 2

## COUNTS FOUR THROUGH EIGHT
### (18 U.S.C. § 1341 – Mail Fraud)

1.      The allegations in paragraphs 1 through 72 of Count One are incorporated herein by reference.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the Defendant,

### BREAL L. MADISON, JR.,

with intent to defraud, devised the scheme described in paragraphs 1 through 72, above, to divert revenue and defraud and obtain money and property by materially false and fraudulent pretenses, misrepresentations, promises, and material omissions and, for the purpose of executing the above-described Scheme to Defraud, knowingly caused to be delivered by an interstate carrier, the United States Postal Service, the following:

| COUNT | APPROX. DATE | CONTENTS |
|---|---|---|
| 4 | 07/16/2020 | Check #8211 for $500,445.29 mailed from Company 2 in Virginia to the Trident UPS Store mailbox in Bowie, Maryland. |
| 5 | 10/22/2020 | Check #8274 for $686,090.58 mailed from Company 2 in Virginia to the Trident UPS Store mailbox in Bowie, Maryland. |
| 6 | 03/11/2021 | Check #8326 for $452,250.00 mailed from Company 2 in Virginia to the Trident UPS Store mailbox in Bowie, Maryland. |
| 7 | 10/12/2022 | Check #71963 for $757,242.00 mailed from Company 2 in Virginia to the Trident UPS Store mailbox in Bowie, Maryland. |
| 8 | 01/19/2023 | Check #482750 for $482,750.00 mailed from Company 2 in Virginia to the Trident UPS Store mailbox in Bowie, Maryland. |

18 U.S.C. § 1341
18 U.S.C. § 2

## COUNTS NINE THROUGH THIRTEEN
### (18 U.S.C. § 1957 – Money Laundering)

1.     The allegations in paragraphs 1 through 72 of Count One are incorporated herein by reference.

2.     On or about the dates set forth below, within the District of Maryland and elsewhere, the Defendant,

### BREAL L. MADISON JR.

did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000 by, through, or to a financial institution, to wit, by transferring funds and making payments as described below, such property having been derived from a specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341.

| COUNT | APPROX. DATE | TRANSACTION |
|---|---|---|
| 9 | 08/06/2021 | Wire of approximately $250,000 from the Trident account at Bank 1 ending in -9394 to an account at Bank 2 for investment in a technology company based on instruction by **MADISON** in the State of Maryland. |
| 10 | 03/07/2022 | ACH wire of approximately $11,342.46 from the Trident account at Bank 1 ending in -9381 for payment of a credit card based on instruction by **MADISON** in the State of Maryland. |
| 11 | 03/31/2022 | Wire of approximately $34,000 from the Trident account at Bank 1 ending -9381 for an investment in cannabis company based on instruction by **MADISON** in the State of Maryland. |

| 12 | 04/29/2022 | Wire of approximately $33,256.00 from the Trident account at Bank 1 ending -9381 for the purchase of a vehicle based on instruction by **MADISON** in the State of Maryland. |
| 13 | 04/29/2022 | Wire of approximately $16,500 from the Trident account at Bank 1 ending -9381 for an investment in cannabis company based on instruction by **MADISON** in the State of Maryland. |

18 U.S.C. § 1957(a)
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.     Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the Defendant that the United States will seek forfeiture as a part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), 18 U.S.C. § 982, and 21 U.S.C. § 853(p), in the event of Defendant's convictions on the offense alleged in Counts One through Thirteen of this Indictment.

### Conspiracy, Bribery, and Mail Fraud Forfeiture

2.     Upon conviction of any offense alleged in Count One through Eight of this Indictment, the Defendant,

### BREAL L. MADISON JR.,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offense.

### Money Laundering Forfeiture

3.     Upon conviction of the offense alleged in Counts Nine through Thirteen of this Indictment, the Defendant,

### BREAL L. MADISON JR.,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offense.

### Property Subject to Forfeiture

4.     The property to be forfeited with regard to Counts One through Thirteen includes, but is not limited to,

a. a money judgment in the amount of at least $9,087,548 in U.S. currency;

b. a Vanquish Model VQ58 motor yacht manufactured by Vanquish Yachts;

c. 2020 Lamborghini Huracan, VIN ZHWUF4ZFLLA12545;

d. 2019 Mercedes Benz S Class, VIN WDDXJ8JB5KA038191;

e. 2020 Mercedes G Class Utility, VIN W1NYC7HJ0LX357232;

f. 2022 Cadillac Escalade Utility, VIN 1GYS4EKL1NR158359;

g. 2022 Cadillac Escalade ESV, VIN 1GYS3JKL7NR112837;

h. 2021 Mercedes Benz Sprinter, VIN W1Z4EGHY8MT073943;

i. 2021 Dodge Durango, VIN 1C4SDJH95MC740802.

### Substitute Assets

5.     If, as a result of any act or omission of the Defendant, any of the property described

above as being subject to forfeiture:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty;

22

the United States shall be entitled to forfeiture of substitute property up to the value of the

forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by 21 U.S.C.

§ 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461 (c)
18 U.S.C. § 982(a)(1)
21 U.S.C. § 853(p)


JONATHAN KANTER                                     EREK L. BARRON
Assistant Attorney General                          United States Attorney


_____                        _____
MICHAEL M. SAWERS
ZACHARY D. TROTTER
ELIZABETH H. FRENCH
Trial Attorneys
Antitrust Division
U.S. Department of Justice
Washington Criminal Section
450 5th Street, NW
Washington, D.C. 20530

A TRUE BILL:


**SIGNATURE REDACTED**___          Date:   10 - 16 - 24
_____